IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STEEL, PAPER & FORESTRY, RUBBER, MANUFACTURING, ENERGY ALLIED INDUSTRIAL & SERVICE WORKERS INTERNATIONAL UNION,       Plaintiff, <br><br> vs. <br><br> NEVILLE CHEMICAL COMPANY,       Defendant. | Civil Action No. 06-640 <br> Judge McVerry <br> Magistrate Judge Mitchell |

REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion for summary judgment submitted on behalf of Plaintiff (Docket No. 14) be granted. It is further recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 17) be denied.

II.    Report

Plaintiff, United Steel, Paper & Forestry, Rubber, Manufacturing, Energy Allied Industrial & Service Workers International Union (Union), brings this action under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) (LMRA), to enforce an arbitration award entered on January 19, 2006. The case arises out of Union member Gregory McCann's discharge by his employer, Defendant Neville Chemical Company (Neville), on March 14, 2005. The Union asserts that Neville is refusing to comply with the arbitrator's decision that McCann be reinstated to his former position, from which he was discharged on March 23, 2005.

Defendant has filed a counter-claim in which it contends that McCann could not be returned to his job as a Packager after the date of the arbitration award because he could not

perform the physical requirements of the job. Therefore, it contends that the relief sought by the Union can only be awarded if it had an extra-contractual duty to create a permanent light duty job for McCann (which it did not) and that the award which reinstated him to his job as Packager simply does not create the outcome sought by the Union herein.

Presently before this Court for disposition are cross-motions for summary judgment. For the reasons that follow, Defendant's motion should be denied and Plaintiff's motion should be granted.

Facts

Plaintiff Union is a labor organization within the meaning of Section 2(5) of the LMRA, 29 U.S.C. § 152(5), and represents employees in an industry affecting commerce within the meaning of Sections 2(3) and (7) of the LMRA, 29 U.S.C. § 152(3) and (7). The Union maintains an office at Five Gateway Center, Pittsburgh, Pennsylvania.

Neville is an employer within the meaning of Section 2(2) of the LMRA, 29 U.S.C. § 152(2), and an employer in an industry affecting commerce within the meaning of Sections 2(2) and (7) of the LMRA, 29 U.S.C. § 152(2) and (7). Neville is a privately owned Pennsylvania corporation with an office and production facility located at 2800 Neville Road, Pittsburgh, PA 15225.

Neville and the Union are parties to a collective bargaining agreement (CBA), covering all production and maintenance workers at the company's Neville Island Plant, except those employees specifically excluded from coverage under the terms of the CBA. Article VIII of the CBA provides that "Differences or disputes between the Company and the Union or employees covered by this Agreement as to the meaning and application of or compliance with the

provisions of this agreement shall be settled in accordance with the provisions of the following article." (CBA Art. VIII, § 8.1.)[1]

Article IX of the CBA provides a procedure for the adjustment of grievances arising under thereunder:

ARTICLE IX

ADJUSTMENT OF GRIEVANCES

> 9.5   Fourth Step: Either party must notify the other in writing of its intention to submit the grievance to arbitration within ten (10) days following the Third Step answer, otherwise such answer shall be final. Upon giving such timely appeal, the Company will submit a joint written request to the U.S. Federal Mediation Conciliation Service to permit joint selection of an arbitrator within six (6) months following the date of the grievance. If the parties are unable to agree on an impartial umpire within ten (10) days following notification, a joint request shall be addressed promptly to the director of the U.S. Mediation and Conciliation Service to provide a panel of umpires from which selection may be made, and this procedure shall be repeated until a mutually acceptable umpire is selected.
>
> The decision of the umpire shall be final and binding on both parties, provided, however, that the umpire shall have authority only to interpret and apply the provisions of this Agreement and shall have no authority to add to, detract from or alter its terms. Expenses of arbitration shall be shared equally by Company and Union, and shall be paid promptly.

(CBA Art. IX, § 9.5.)

Article X of the CBA further provides for management rights under the CBA, including management's right to "suspend or discharge" employees. (CBA Art. X, § 10.1.) Under the terms of that CBA, however, that right is specifically subject to the restriction that such suspension or discharge must be "for proper cause." Likewise, Article X bestows on management "the right to relieve employees from duty." That right, however, is subject to the

---

[1] Def.'s App. (Docket No. 20) Tab A.

restriction that such relief from duty must be "because of lack of work, or for other legitimate reasons." (CBA Art. X, § 10.1.) Article XI of the CBA further provides for specific procedures for the handling of employee discharges and processing of any grievances arising as a result of any such discharge. (CBA Art. XI, §§ 11.1-11.4.)

McCann has been employed by Neville for over twenty-five years. Until 2003, he worked as a Sweeper Operator. In 2003, McCann's regular Sweeper Operator position was abolished, and based on his seniority within the bargaining unit, McCann became a Packager, which is a labor-intensive job involving loading, unloading, and slinging packages. (Pesce Decl. ¶ 2.)[2]

On or about May 19, 2004, while working as a Packager, McCann injured his back while lifting a broken resin bag. McCann underwent treatment at Sewickley Valley Hospital and subsequently treated with Dr. Werries and Dr. Maratta, and completed a course of 12 physical therapy sessions during June 2004. (Def.'s Statement Undisputed Material Facts ¶ 10;[3] Pl.'s Resp. ¶ 10.[4])

In July 2004, McCann returned to work, performing light duty work within restrictions set by his treating physician, James P. McDowell, D.O. Dr. McDowell, in a deposition submitted in connection with McCann's workers' compensation claim, stated that, as of July 12, 2004:

> I felt that he could do some aspects of his job in a limited capacity, and instead of doing full capacity, I thought that he could at that point do lighter work and could lift or carry but less than half of his normal amount.

---

[2] Docket No. 20 Tab I.

[3] Docket No. 19.

[4] Docket No. 33.

Dr. McDowell restricted McCann's lifting restriction to 11 to 25 pounds. (McDowell Dep. at 11-12.)[5]

Prior to March 2005, the Light Duty Policy at Neville (published in November 1999) provided for a light duty period of no more than three months if the employee's treating physician certified that the employee could return to full duty within three months: "Light-duty employment may continue for a period of up to three months if your treating health care provider certifies that a full-duty return to work will be provided during this time period." (Pesce Suppl. Decl. ¶ 1 & Ex. 1.)[6]  The Union and Neville commenced bargaining to revise the Light Duty policy in 2003. (Pesce Supp. Decl. ¶ 2.) As a result of these negotiations, the Return to Work Procedure effective March 2005 provides:

> An injured employee may be assigned work according to the combination of availability of work commensurate with physical limitations provided in writing by the attending physician.

(Docket No. 20 Tab B ¶ 4.1.1; Pesce Decl. ¶ 6 & Ex. 3.)

Neville contends that, because McCann's prognosis was that he was temporarily injured and subject to a future return to full duty work, he became and remained eligible for light duty under the Return to Work Procedure. In the months following McCann's work injury of May 19, 2004, Dr. McDowell reported that McCann's condition continued to improve:

> Q: Now, you referenced an office visit of July 12, 2004 previously. Is that the first date you personally saw Mr. McCann?
>
> A: Yes.

---

[5]   Docket No. 20 Tab E.

[6]   Def.'s App. II (Docket No. 29) Tab L.

>   Q: Did you discuss with him at all his work injury at that time?
>
>   A: I did.
>
>   . . . .
>
>   Q: What was Mr. McCann's complaints at the time of your initial visit on July 12, 2004?
>
>   A: It was back pain that was better than previously but still present.
>
>   . . . .
>
>   Q: When was the next occasion you saw Mr. McCann?
>
>   A: 8-12-04.
>
>   Q: What was his updated history at that time?
>
>   A: He felt that he was better. He was taking Flexed once a day. He was on modified duty, discharged from physical therapy. He requested to increase his work from four to eight hours a day.

(McDowell Dep. at 9-10, 12.)

<u>McCann's Incidents and Grievances</u>

While he was working with restrictions, McCann was involved in two incidents. The first incident, which occurred on February 15, 2005 (in which he was accused of failing to follow instructions with respect to a leaking drum), resulted in an unpaid disciplinary suspension for three days. The second, which occurred on February 20, 2005 (in which he was accused of failing to follow instructions with respect to cleaning up a Packaging Center), resulted in another unpaid disciplinary suspension, this time for five days and subject to discharge. Neville converted the five-day suspension to a discharge, after a hearing. (Docket No. 20 Tab C (Award I), Tab D (Award II).) McCann last worked on March 14, 2005, when he was suspended for five days without pay and subject to discharge for the incident that occurred on February 20, 2005.

(Award II at 4.)

On March 15, 2005, the Union filed Grievance Nos. 05-15 and 05-16, relating to each of the two incidents, which were denied by Neville and subsequently submitted to arbitration before Arbitrator Elliot Newman. Hearings were held on October 18, 2005 (as to # 05-16) and November 9, 2005 (as to #05-15).

On January 19, 2006, Arbitrator Newman issued separate, simultaneous Awards deciding each grievance. In his Award deciding Grievance #05-16, Arbitrator Newman determined that Neville "did not have proper cause ... to suspend ... McCann for three days for the incident on February 15, 2005," and directed that McCann be "made whole for three days pay." (Award I at 8.)

With respect to Grievance #05-15, Arbitrator Newman determined that "[p]roper cause existed to discipline [McCann] for failing on February 20, 2005 to follow instructions" (relating to his failure to adequately clean up the Packaging Center as he had been instructed to do). However, as a result of the companion award relating to Grievance #05-16, Arbitrator Newman reduced the discharge to a "three day [suspension] without pay on March 20, 21 and 22, 2005 as the next step in progressive discipline." Arbitrator Newman also directed Neville to "reinstate" McCann with no loss of seniority and make him whole in terms of backpay and benefits, "minus" any unemployment compensation benefits he had received. (Award II at 5-6.)

The parties agree that, after Arbitrator Newman issued his Awards, Neville reimbursed McCann for three days pay owing from his improper first suspension, which had been overturned by Arbitrator Newman in his decision on Grievance #05-16. Neville further reimbursed McCann for two days pay for the reduction in his second suspension from five days to three days as

7

ordered by Arbitrator Newman in his decision on Grievance #05-15. Neville also reinstated McCann's health insurance benefits and seniority and paid him the balance due him for his 2005 vacation and holiday pay. (Def.'s Statement ¶ 27; Pl.'s Resp. ¶ 27.)

Neville did not, however, allow McCann to return to work at this time. It contends that it could not reinstate him to the Packager position he held at the time of his discharge because of his physical restrictions.

Neville notes that, while the grievances were pending and undecided, on April 11, 2005, Dr. McDowell recommended that McCann visit Dr. Alexander Kandabarow "for consideration of further medical or surgical treatment." (McDowell Dep. at 14.) Dr. Kandabarow, in a deposition submitted in connection with McCann's workers' compensation claim, stated that McCann's injury prevented him from performing repetitive lifting of 50 pounds or more, one of the requirements of the Packager position:

> [McCann's] diagnosis is degenerative disk disease at T-12, L-1; L-1, L-2; as well as L-5, S-1 spondylolisthesis and degenerative disk disease at L-4, -5.
>
> . . . .
>
> [P]rognosis is that he will have increased episodes of back pain when he does do any kind of lifting of 50 pounds or more or any kind of repetitive lifting in that weight range.

(Kandabarow Dep. at 12-13 ).[7]

Dr. McDowell agreed that McCann could not repetitively lift 50 pounds or more, as required for the Packager position:

> Q: Doctor, I would ask you to assume that Mr. McCann in his position with Neville Chemical worked as a packager, and as you indicated earlier in

---

[7] Docket No. 20 Tab F.

>  you testimony, I had asked you to assume his job requires him to lift 50-pound bags on a regular basis, but I would ask you to further assume that Mr. McCann would be required to palletize these bags by placing as they came off the conveyor and are filled bag by bag, one 50-pound bag would be placed on a pallet that are then stacked in groups of four up to ten bags high, that this activity is done on a basis where 40 bags are palletized per hour and a minimum of 300 bags are palletized per shift.
>
>  Assuming those job duties to be accurately described, do you have an opinion as to whether Mr. McCann can go back and perform that type of job on a regular 8-hour day, 5-day-a-week basis?
>
> A:  Yes. My opinion would be no, he's unable to do that.
>
> Q:  Why not?
>
> A:  Because his pattern is such that when he does do that, he develops back pain which is unrelenting and requires treatment.
>
> Q:  What's his prognosis if he continues to work in that type of job?
>
> A:  I feel it's poor and that he would have frequent exacerbations of back pain.
>
> Q:  What's his prognosis if he would work in a position that did not require this type of repetitive consistent lifting?
>
> A:  He would be good.

(McDowell Dep. at 17-18).

Neville also notes that, at his final workers' compensation hearing, on August 25, 2005, McCann testified before the Workers' Compensation Judge that it continued to be his understanding that he was limited to occasionally lifting no more than 20-50 pounds; i.e., he could not lift and stack the 50 pound bags at the required rate of 300 bags per shift for the Packager position. Although McCann believed that his symptoms had improved, he "attributed this to the fact that he was not repetitively lifting during an eight hour work shift." (Docket No.

20 Tab G (Proposed Findings Third, Eleventh).)[8]

Post Hearing Developments

On March 8, 2006, the Union's Senior Associate General Counsel, Richard J. Brean, wrote a letter in which he stated that:

> I understand that as of today's date Neville Chemical Company has neither reinstated Mr. McCann nor otherwise made him whole as ordered by Arbitrator Newman. The Company is bound to comply with this Award under the Collective Bargaining Agreement. Your failure to comply is completely without justification.
>
> Please be advised that if the Company does not comply with Arbitrator Newman's Award in full by Wednesday, March 15, 2006, the United Steelworkers will file suit against it in U.S. District Court, to enforce Arbitrator Newman's Award under Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. You should be further aware that under Section 301 the union can recover not only the amount owed to Mr. McCann, but also the costs and reasonable attorneys' fees incurred in litigation to enforce the award and any other relief that the court determines may be just and proper.

(Pesce Decl. ¶ 8 & Ex. 5.)

In response to Brean's letter, William J. Pesce, Neville's General Counsel and Director of Human Resources (Pesce Decl. ¶ 1), by letter dated March 13, 2006, noted McCann's position in the workers' compensation proceeding that he was "temporarily, totally disabled from performing the Packager's job," and explained that, "given [McCann's] claim of disability, [Neville] does not see how [McCann] can return to work at this time."  (Pesce Decl. ¶ 9 & Ex. 6.)

Brean responded by letter dated March 17, 2006, stating that:

> It is my understanding that Mr. McCann was working at the time he was

---

[8] On June 26, 2006, the Workers' Compensation Judge issued a decision denying McCann's claim on the ground that he had failed to establish that, on May 19, 2004, he suffered a cognizable work injury resulting in any impairment, disability or need for medical treatment. (Docket No. 20 Tab H at 7.)

> discharged and was assigned to light duties. Arbitrator Newman also notes in both Awards that Mr. McCann was working with physical restrictions, at the time of the events grieved.
>
> I further understand that the Company continues to make light duty assignments available to other employees as needed, including employees with lesser seniority than Mr. McCann. Mr. McCann has advised the Union that there has been no change in his condition which would require any modification of his physical restrictions since the time of his unjust discharge. Nonetheless, the Company has failed to allow Mr. McCann to return to work in direct contravention of the Arbitrator's instructions.
>
> Mr. McCann should be immediately reinstated and made whole, including but not limited to back pay, benefits, and no loss of seniority from March 23, 2005, just as Arbitrator Newman has ordered. If the Company refuses to comply with Arbitrator Newman's Award, the Union will be compelled to file suit to enforce this award.

(Pesce Decl. ¶ 10 & Ex. 7.)

> By letter dated March 23, 2006, Pesce responded that:
>
> Neville Chemical Company has a negotiated Light Duty Policy with the Local Union and to be a candidate for temporary work under that Policy, an employee must be making medical progress towards a full duty recovery to his pre-injury position. At the time Mr. McCann was suspended and discharged, and his prognosis was positive in this regard.
>
> Following his discharge, Mr. McCann saw two different physicians in April 2005. The first physician opined that based upon his examination of Mr. McCann he did not believe that, McCann would be capable of performing his pre-injury position as a Packager on a regular eight-hour, five day a week basis. The second physician likewise offered that, in his opinion, McCann not lift greater than 50 pounds and avoid repetitive lifting.
>
> Mr. McCann, himself, testified at the Final Workers' Compensation hearing that it was his understanding that he was limited to occasionally lifting not more than 20-50 pounds.
>
> The above mentioned Light Duty Policy does not contain a provision for "permanent" light duty. Regardless of Mr. McCann's seniority, given his current restrictions, which have been represented to Neville to be permanent in nature, he is not a candidate to return to work under that policy.

11

> If Mr. McCann can demonstrate to the Company that his restrictions have changed, Neville will be [more] than willing to re-evaluate him for a return to work under the Light Duty Policy.

(Pesce Decl. ¶ 11 & Ex. 8.)

On November 17, 2006, Neville created and posted several "Production Trainee" positions, which could be performed within McCann's restrictions. (Pesce Decl. ¶ 15.) On November 27, 2006, Neville notified McCann that work was available for him in this position. (Nolte letter, Docket No. 16 Ex. 1.) McCann returned to work as a Production Trainee on December 4, 2006. (Pesce Decl. ¶ 16.)

> Vice President of Manufacturing John Ferguson explains that:
>
> At Neville, Production Trainees assist operators and are expected to perform any work required in the Warehouse and Resin Production Departments. This includes, but is not limited to, general plant material transfers, loading or offloading tanker trucks, pouring resin into 55 gallon drums, flaking resin into super sacks (1,000 to 2,000 lbs), assisting Kettle Pumpers in adding crushed gum rosin to the kettles, flaking 50-pound resin bags (which involves repetitive lifting and stacking), and general housekeeping.
>
> Because the duties of a Production Trainee do not include the full-time lifting and stacking of 50 pound resin bags (which is an essential function of a Packager in the manual packaging center), it was determined that McCann could be returned to active employment and accommodated in the position of Production Trainee.
>
> In accommodating McCann's permanent lifting restrictions, McCann is not assigned any of the restricted lifting duties (*i.e.*, lifting and stacking 50-pound resin bags) and such tasks (when required) are assigned to other employees on McCann's shift.

(Ferguson Decl. ¶¶ 1, 5-7.)[9]

---

[9] Docket No. 29 Tab M.

Procedural History

Plaintiff filed this action to enforce the arbitration award on May 15, 2006.  It contends that Neville failed to comply with Arbitrator Newman's award that McCann be reinstated.  It notes that Neville has not paid McCann any back pay for the time he was off work beginning from March 23, 2005 to December 4, 2006, nor has the company in any other way made McCann whole for any losses he incurred during this period

On December 15, 2006, cross-motions for summary judgment were filed.

Standard of Review

Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Woodside v. School Dist. of Philadelphia Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001) (quoting Foehl v. United States, 238 F.3d 474, 477 (3d Cir. 2001) (citations omitted)).  In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor.  Doe v. County of Centre, PA, 242 F.3d 437, 446 (3d Cir. 2001); Woodside, 248 F.3d at 130; Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999).

Enforcement of Arbitration Awards

As the Supreme Court has repeatedly held:

Judicial review of a labor-arbitration decision pursuant to such a [collective bargaining] agreement is very limited.  Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement. [United] Paperworkers [Int'l Union] v. Misco, Inc., 484 U.S. 29, 36 (1987).  We recently reiterated that if an "'arbitrator is even arguably construing or applying the contract and acting within

13

> the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (quoting Misco, supra, at 38, 108 S.Ct. 364). It is only when the arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision may be unenforceable. Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's "improvident, even silly, factfinding" does not provide a basis for a reviewing court to refuse to enforce the award. Misco, 484 U.S., at 39, 108 S.Ct. 364.

Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001).

In this case, Neville has not sought to have the award vacated, nor does it argue that the arbitrator's award was not reasonably based on the provisions of the CBA. Rather, it contends that it could not comply with the award to the extent that it directed the company to "reinstate" McCann to his position as a Packager because he was not capable of performing the physical requirements of this position. The Union responds that Neville did not raise the issue of McCann's physical restrictions before the arbitrator and has waived the right to raise it here as a defense to the enforcement of the award.

Both parties cite United Food & Commercial Workers Union Local 1776 v. Excel Corp., 470 F.3d 143 (3d Cir. 2006), in support of their positions. In that case, the company concluded that an employee (Diaz) had attempted to steal meat by use of a stolen receipt. The company (Excel) suspended Diaz on October 31 and discharged him on November 1. When informed of his termination, Diaz allegedly reacted violently by attacking an Excel security guard, breaking two of his ribs. Although Excel raised both the theft and the assault as sufficient causes for terminating Diaz, the arbitrator limited his discussion to the theft issue. He concluded that Excel had not established just cause for terminating Diaz for attempted theft and ordered him

reinstated. Excel then paid Diaz from the date he was suspended to the date he attacked the security guard (one day) and terminated him effective November 1 for the assault. The union contended that Excel had failed to comply with the arbitration award, but the Court of Appeals disagreed, concluding that the letter served as a de facto reinstatement and noting that the union could challenge Diaz's second termination in a subsequent arbitration. Id. at 148-49.

      The Excel case does not help Neville here, however, because it did not place before the arbitrator the issue of McCann's limited physical capacities. Nor did Neville advise McCann that it was paying him from the date he was wrongfully discharged to the date he became ineligible for reinstatement (in its opinion) because of his physical limitations, as did the employer in Excel. Rather, Neville seeks now to avoid complying with the award's reinstatement requirement on the grounds that McCann could not perform the physical requirements of the Packager position. It also argues that the Union is seeking to have Neville create a permanent light duty position, although it has no duty to do so and the Union did not raise this issue before the arbitrator.

      An employer's failure to make a timely motion to vacate an arbitration award precludes the employer from raising defenses it could have raised in such a motion in response to an employee's motion to enforce the award. See Service Employees Int'l Union Local 36 v. City Cleaning Co., 982 F.2d 89, 93 (3d Cir. 1992). Under Pennsylvania law, a party has thirty days to bring an action to modify, vacate or correct an arbitrator's award. 42 Pa. C.S. § 7314(b). See Eichleay Corp. v. International Ass'n Bridge, Structural & Iron Workers, 944 F.2d 1047, 1061-62 & n.17 (3d Cir. 1991). Neville did not file a motion to vacate the awards and the time in which it could have done so is long past. Therefore, it cannot argue in this case that McCann was

physically incapable of performing the requirements of the job to which Arbitrator Newman ordered him reinstated.

A case presenting a similar situation is <u>United Steel Workers of America, AFL-CIO, CLC v. Dayton-Walther Corp., Muncie Div.</u>, 657 F. Supp. 50 (S.D. Ind. 1987).  In that case, the company discharged an electrician (Priest) and the union brought the case to arbitration.  The arbitrator ordered Priest reinstated, but the company did not comply.  Rather, it requested that Priest take a "return-to-work" physical, which he did and failed.  The company claimed that it could not return Priest to his electrician's position because he failed the physical exam.

The court noted that neither party disputed that the arbitrator's award was reasonably based on the provisions of the CBA, that the company had not introduced any evidence of Priest's physical condition during the arbitration, and that the company had not moved to vacate the award.  The court concluded that:

> the Company should not be permitted to raise, as a defense to reinstatement, Priest's poor physical health, when the Company completely failed to present this issue to the arbitrator.  Not at any time during the hearing before Arbitrator Render on October 4, 1984, did the Company mention that Priest might be unable to perform, in a safe and satisfactory fashion the duties of an electrician, although recognizing even then that an employee who is not medically fit can be a danger to himself and his co-workers.
>
> . . . .
>
> In order to reach a fair solution to this problem, Arbitrator Render should have been apprised of all available information bearing on the appropriate remedy to be devised.  In the event that Arbitrator Render found that Priest should be reinstated, information concerning Priest's back injury could have resulted in some preconditions in the award prior to reinstatement.  In addition, the Company, once it was notified of the arbitrator's decision, could have sought clarification, reconsideration, or modification, upon timely referral back to the arbitrator of the results of Priest's physical examination; but apparently no such action was taken.  In order to preserve the efficiency and integrity of the arbitral process, the Company ought to be, and therefore is precluded from relief from the enforcement

of the arbitrator's order on the ground that Priest's reinstatement is not possible. Id. at 55.

The court acknowledged that reinstatement did not mean that Priest had perpetual job security at the company's Muncie plant: "Should Priest, for instance, be unable to perform his duties as an electrician, the Company could take the steps necessary to correct the situation. This subsequent Company action, of course, if controverted, would be evaluated independently of the present action." Id. (citations omitted). However, by subjecting Priest to the "return-to-work" exam and refusing his reinstatement instead, the company "failed to comply with the plain mandate of the arbitration award." Id. at 56. See also Teamsters Local 243 v. DHT Transportation, 2006 WL 2844141, at *3 (E.D. Mich. Sep. 29, 2006) (when arbitrator ordered the company to reinstate a discharged mechanic, the company could not require the mechanic to pass a driver's test when it failed to raise the issue that he might fail such a test before the arbitrator).

Similarly, in this case, Neville could have raised McCann's physical limitations before Arbitrator Newman but did not do so. Union International Staff Representative Charles Leonard, who represented the Union at both arbitration hearings (Leonard Aff. ¶ 3),[10] states that:

> In these arbitration proceedings, both Company and union witnesses testified that at the time Mr. McCann was disciplined and discharged, he was actively working at the Company's Neville Island facility, and that he was working subject to a work restriction that he could not lift more than 50 lbs.
>
> To the best of my knowledge and recollection, the Company did not introduce into evidence, in either arbitration proceeding, any physician's reports or other such information relating to Mr. McCann's medical condition or any change in his medical condition since his discharge.
>
> To the best of my knowledge and recollection, the Company did not argue,

---

[10]    Docket No. 16 Ex. 2.

17

>   at any time in either arbitration proceeding, that the Company would be unable to reinstate Mr. McCann or return him to work due to his work restrictions.

(Leonard Aff. ¶¶ 5-7.)  The Union has also submitted Neville's answers to the Union's grievances and its arbitration briefs, which do not make any mention of this issue.  See Docket No. 32 Tabs C, E, F, H.  Neville has presented no evidence to the contrary.

Moreover, the awards mention that McCann may have been operating under a restriction that he could not lift 50 pounds, although this information was not critical to the decisions as to whether Neville had cause for the actions it took.  The medical records that Neville now cites to demonstrate that McCann was incapable of performing the job to which he was ordered reinstated were in existence before the hearings on the two grievances, but Neville did not refer to them.  By failing to raise McCann's limitations before the arbitrator, Neville waived the right to raise the issue here as a defense to the enforcement of the award.

Finally, Neville argues that McCann could not be "reinstated" because he did not meet the requirements of the Return to Work Procedure.  See Pesce Decl. ¶ 13 ("McCann has never provided notification of his eligibility to return to work or a release.")  Neville contends that McCann was not "making marked progress towards returning to restricted or full duty status." (Docket No. 20 Tab B ¶ 4.2.5.)

However, McCann was not attempting to return to work following an absence due to an injury.  Rather, he was ordered reinstated by Arbitrator Newman following his discharge and the arbitration of a dispute.  Thus, the Return to Work policies cited by Neville are irrelevant.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Plaintiff (Docket No. 14) be granted.  It is further recommended that the motion for summary judgment submitted on behalf of Defendant (Docket No. 17) be denied.

      Within ten (10) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

                                            Respectfully submitted,

                                            s/Robert C. Mitchell
                                            ROBERT C. MITCHELL
                                            United States Magistrate Judge

Dated: March 28, 2007